**UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA**

**JESSICA CARLSON**

    **Plaintiff,**

v.            **ORDER & MEMORANDUM
               Civil File No. 05-1438 (MJD/SRN)**

**EXTENDICARE HEALTH
SERVICES, INC.,**

    **Defendant.**

Clayton D. Halunen, Halunen & Associates, Counsel for Plaintiff.

John D. Thompson, Oberman, Thompson & Segal, LLC, Counsel for Defendant.

## I.  INTRODUCTION

This matter is before the Court on Defendant Extendicare's motion for summary judgment.  [Docket No. 67.]  Defendant seeks dismissal of Count I of the Complaint along with its costs and fees associated with the motion.  The Court heard oral argument on June 7, 2005.

## II.  FACTUAL BACKGROUND

Plaintiff Jessica Carlson ("Carlson") is a Minnesota resident and former employee of Defendant Extendicare Health Services, Inc. ("Extendicare"), a Delaware corporation.  Extendicare is a for-profit company that operates skilled

nursing facilities in the Twin Cities.

### A.   Carlson's Position with Extendicare

Carlson was employed by Extendicare at its Trevilla facility ("Trevilla") in Golden Valley, Minnesota, from August 2004 to February 2005.  Her position as a Health Unit Coordinator ("HUC") in the Medical Records department required performance of clerical tasks, organization of the ward, resident interaction and assistance, fulfilling physician orders and arranging resident appointments and transportation.  (Halunen Aff. Ex. 5 ¶ 1.)  From January 2005 to the time of her resignation, Carlson was stationed on the second floor ward, the floor designed for short-term or transitional patients.  (Halunen Aff. Ex. 5 ¶ 7.)

As an HUC, Carlson reported to Medical Records Supervisor Diane Boelke. (Halunen Aff. Ex. 9 at 24-25.)  Additionally, each resident floor has two Clinical Coordinators that perform clinical assessments of residents, establish care plans and oversee the licensed practical nurses ("LPNs") on the floor.  (Id. ¶ 28.)  While HUCs do not report to the Clinical Coordinators, they do receive direction from them.  (Cullen Aff. ¶ 27.)  Clinical Coordinators Jeannie Cantwell and Christine Bates worked with Carlson on the second floor.  (Halunen Aff. Ex. 9 at 27.)

Each Extendicare facility is managed by an Administrator charged with overall responsibility for the facility and a Director of Nursing (DON), who has overall clinical responsibility for the facility.  (Cullen Aff. ¶ 8.)  Todd Dickson is the

Trevilla facility DON.  The DON reports to the Administrator, while the Administrator reports to the Regional Director of Operations ("RDO").  (Id.)  Susan Cullen is the RDO with oversight of all Minnesota facilities.  (Halunen Aff. Ex. 8 at 10.)

Pursuant to Extendicare policy, all employees are required to report possible legal and regulatory concerns up the chain of command until the problem is resolved.  (Cullen Aff. ¶¶ 11-22.)  Failure to report incidents, defined as any "unusual occurrence," may result in employee discipline.  (Id. ¶ 14.)  This policy was explained during Carlson's new employee orientation and in company literature.  (Id. ¶ 18; Thompson Aff. Exs. 4 and 5.)

**B.    Allegations Concerning Trevilla Resident Care**

Carlson alleges that the Trevilla facility attempted to keep the percentage of facility beds occupied high in order to secure Medicare funding.  She alleges that upon inquiry, Boelke explained to her that when the facility's census was high, the facility would not hesitate to send patients to the hospital because the facility would be reimbursed for holding the resident's bed during the hospital stay, but if the census was low patients would not be sent to the hospital because the state would not pay to hold a bed when there are many available for new patients.  (Halunen Aff. Exs. 5 ¶ 4, 9 at 30-31.)  Carlson refers to this as the "do not send" policy and states that she was present when the Assistant Director of Nursing and

DON Dickson told the Clinical Coordinators "do not send to the hospital . . . the census is low." (Halunen Aff. Exs. 5 ¶¶ 5, 6.)

In Minnesota, Medicaid (not Medicare) will pay to reserve a Medicaid-eligible resident's bed if a facility has an average monthly occupancy rate of 93 percent or more. Minn. Rule 9505.0415, subp. 7. Medicaid will pay for a maximum of 18 consecutive bed hold days. Id., subp. 5. Medicare and private pay residents must pay privately if they wish the facility to hold a bed. (Thompson Aff. Ex. 14, Part B.) Trevilla's monthly census did not drop below a monthly average of 93% while Carlson worked there. (Thompson Aff. Ex. 15.)

### C. Patient "CP"

Carlson testified to numerous incidents of patient abuse and neglect at the Trevilla facility. The incident relevant to this case involve a patient identified as "CP."

On February 16 and 17, 2005, an series of incidents took place involving CP, a patient residing on Carlson's floor. During this time, Boelke was out and Carlson took direction from Dickson and Bates. CP was a 57-year-old woman clinically diagnosed with chronic obstructive pulmonary disease, chronic hypoxia (low oxygen), hypertension, congestive heart failure, morbid obesity, schizoaffective disorder, and other mental and physical ailments. (Thompson Aff. Ex. 18.) According to notes on CP's medical chart for the period of February 11-15, 2005,

4

CP was refusing medicine and blood sugar checks.  (Id.)

On February 16, 2005, at approximately 2:00 p.m., CP began yelling and requesting oxygen.  (Halunen Aff. Exs. 4, 9.)  She asked the staff to call an ambulance to take her to the hospital.  (Halunen Aff. Ex. 4.)  At 3:00 p.m., CP's physician was called, who ordered a chest x-ray, complete blood count and oxygen at 2-3 liters to keep her oxygen saturation level at 90% or above.  (Id.)  Bates instructed staff that CP was not to be sent to the hospital.  (Halunen Aff. Exs. 9 at 107, 5 ¶ 12.)  At 3:15 p.m. CP called 911 and requested an ambulance to take her to the hospital.  (Halunen Aff. Ex. 4, p. 2.)  When the paramedics arrived, Bates sent them away, explaining that CP was "psych" and had been refusing medication all day.  (Halunen Aff. Ex. 9 at 102.)  When CP arrived at the nurse's station to wait for the ambulance, Bates informed her that the ambulance was sent away because she did not need to go to the hospital.  (Halunen Aff. Ex. 5 ¶ 14.)  CP said she couldn't breathe and began to throw everything off the nurse's station.  (Id.)  CP's oxygen saturation level was taken at 3:30 p.m., which registered 93%.  (Halunen Aff. Ex. 4.)  CP's medical records were not updated after 3:30 p.m. on February 16 until 2:00 p.m. on February 17, 2005.  There is no notation in CP's medical records that she received oxygen, that her oxygen levels were checked during that time period or that she had called 911 for an ambulance.  (Halunen Aff. Ex. 4.)

On the morning of February 17, 2005, CP's oxygen was checked three times, and an LPN noted oxygen levels at 60% or below. (Halunen Aff. Ex. 4 at p. 3.) CP had been removing her oxygen tube. (Id.) The LPN reported these levels to Bates and asked to send CP to the hospital. According to Carlson, Bates denied any requests to send CP to the hospital and told the LPN to give CP oxygen. (Halunen Aff. Ex. 5 ¶ 15.) At 2:00 p.m., staff noted on CP's medical chart that she was refusing medication and removing her oxygen. CP's physician was called because her oxygen level was 30-35%. (Id.) CP's physician told the staff to recheck the oxygen reading and to send CP to the emergency room. At 2:30 p.m. an ambulance was called to take CP to the hospital. (Id.) However, when the LPN returned to CP's room, she found that CP was unresponsive and that her lips and nail beds were blue. At 2:40 p.m., CP was pronounced D.O.A. (Id.) Carlson testified that when she expressed shock at CP's death, Bates responded, "Well, she wanted to die," adding, "this really messes up our census." (Halunen Aff. Ex. 4 at 120, 172.)

### D. Carlson's Actions

Carlson was disturbed by CP's death and on February 17, 2005, went to Director of Nursing Todd Dickson to report her concern that CP had been neglected. (Halunen Aff. Ex. 5 ¶ 21.) Dickson asked her about what happened and assured her that he would investigate her claims. Dickson did not ask her to

fill out any forms or document her concerns. (Id.) Carlson also told Boelke and a human resources employee, Lila Neumann, about her concerns. Boelke told her to contact the State of Minnesota if she did not get immediate results. (Halunen Aff. Ex. 9 at 40.) Carlson checked CP's chart and determined that it had not been updated from February 16 at 3:30 p.m. until 2:00 p.m. on February 17, 2005.

On February 21, 2005, Carlson called the Minnesota Department of Health ("DOH") to report the possible neglect of CP by Extendicare and possible violations related to the bed hold/hospitalization issue. Assuming that Trevilla staff would know that she had made the complaint because of her complaints to Dickson and others, Carlson gave the DOH her name. The DOH appeared at Trevilla unannounced at 1:20 p.m. on February 23, 2005. After conducting an investigation on February 23, 25 and March 2, 2005, DOH ultimately concluded that neglect of CP did occur due to a "breakdown in [Trevilla's] system" and Extendicare was found to have violated several federal regulations and state licensing rules. (Halunen Aff. Ex. 4.)

### E. Alleged Retaliatory Acts Against Carlson

Carlson claims that she was retaliated against for reporting the neglect of CP. On February 23, 2005, the day the DOH arrived unannounced at Trevilla, Bates told co-workers that Carlson was "lying and making things up," that she was "was out to get her, that [she] hated her" and said "I don't know why she's doing

this to me." (Halunen Aff. Ex. 9 at 137, 141.)  Bates reprimanded her in front of other employees for a charting error. (Id.)  Carlson assets that Dickson and other employees began huddling and whispering around her and would not talk to her. Dickson in particular "wouldn't even look at her." (Id. at 141, 143)  Carlson states that other employees refused to "acknowledge her existence" and were short with her. (Id. at 142.)  Carlson mentioned this treatment to Boelke, who informed her that there was nothing she could do. (Id. at 145.)

That same day, at 4:00 p.m., Carlson gave notice of her resignation to Boelke.  Her resignation letter states that she respected Boelke but was not "cut out emotionally" for the job and that her last day would be March 9, 2005. (Thomson Aff. Ex. 6.)  However, Carslon's last day at Extendicare was February 25, 2005.  Sue Cullen called Carlson after her last day for a exit interview over the phone, at which time Carlson explained that she could not work for a company that would refuse to send a patient to the hospital or fail to conduct an investigation of possible abuse and neglect of a patient. (Halunen Aff. Ex. 8 at 9.) Carlson further testified: "I felt I had no choice [but to leave Extendicare employment] because I felt like they didn't want me there anymore.  I felt I couldn't work for a company that would– would do that to another human being. I felt just all-around horrible just being in that environment." (Carlson Dep. at 177.)  After the CP incident, Carlson was not demoted or disciplined in any way.

8

**F.    Current Action**

Carlson filed a Complaint against Extendicare in Minnesota state court on June 22, 2005. Extendicare removed the action to this Court on July 18, 2005. Count I of the Complaint alleges violations of the Minnesota Whistleblower Statute, Minn. Stat. § 181.932. Carlson alleges that she reported violations of the False Claims Act, the Minnesota Resident Bill of Rights and violations of Medicare regulations. Carlson alleges that Extendicare retaliated against her as of a result of her reports and refusals to participate in practices that she believed violated state and federal laws, by denying her employment opportunities and constructive termination. She requests injunctive relief, reinstatement or payment for employment, compensatory damages, damages for mental and emotional anguish, punitive damages and fees and costs.

Count II of the Complaint alleges negligent supervision. However, the parties agree that Carlson's negligent supervision claim was dismissed with prejudice by stipulation.

**III.    DISCUSSION**

**A.    Summary Judgment Standard**

Summary judgment is appropriate if, viewing all facts in the light most favorable to the non-moving party, there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ.

P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The party seeking summary judgment bears the burden of showing that there is no disputed issue of material fact. Id. at 323. Summary judgment must be granted when the opposing party fails to make a showing that supports the existence of an element essential to the case and on which the opposing party bears the burden of proof at trial. Id. at 332-33. Summary judgment should seldom be used in employment discrimination cases. Crawford v. Runyon, 37 F.3d 1338, 1341 (8th Cir. 1994) (citation omitted).

**B.     Minnesota Whistleblower Act**

Carlson claims that Extendicare retaliated against her for making reports of alleged illegal activity, in violation of the Minnesota Whistleblower Act ("Whistleblower Act"), Minn. Stat. § 181.932. This claim is analyzed under the traditional McDonnell Douglas burden shifting analysis. See Cokley v. City of Otsego, 623 N.W.2d 625, 630 (Minn. Ct. App. 2001).

Under McDonnell Douglas, the plaintiff bears the initial burden of proving a prima facie case under the statute. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). The burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action. Id. Finally, to prevail, the plaintiff must show that the defendant's articulated reason was pretextual. See id. at 804.

The Whistleblower Act prohibits retaliation against an employee who "in good faith, reports a situation in which the quality of health care services provided by a health care facility, organization, or health care provider violates a standard established by federal or state law or a professionally recognized national clinical or ethical standard and potentially places the public at risk of harm." Minn. Stat. § 181.932, subd. 1(d).

Under Minnesota law, a prima facie case under the Whistleblower Act consists of: (1) statutorily protected conduct by the employee; (2) adverse employment action by the employer; and (3) a causal connection between the two. Ring v. Sears, Roebuck and Co., 250 F. Supp. 2d 1130, 1135 (D. Minn. 2003); Cokley, 623 N.W.2d at 630.

### 1. Statutorily Protected Conduct

The Complaint alleges that Carlson was retaliated against both for making a protected report, in violation of Section 1(d) and for refusing to participate in practices that she believed violated state and federal laws, in violation of Section 1(c). (Compl. ¶ 1.). However, facts have not been alleged to support the allegation of retaliation for refusal to participate in suspected illegal activity. Thus, the Court will consider only whether Carlson made a protected report.

Extendicare argues that Carlson is not protected by the Whistleblower statute because she was simply doing her job when she contacted the DOH to

report compliance concerns.  Because the Act does not protect individuals who are required to analyze the employer's legal and regulatory compliance in the course of their employment, Extendicare asserts that Carlson's claim must fail.  Extendicare further contends that Carlson has not proven that her report of unlawful conduct was made in good faith because she had no understanding of the bed hold policy and census figures, and thus she was without a good faith belief that Extendicare had violated the law.  Extendicare argues that Carlson conducted no investigation as to whether it was appropriate to send CP and other patients to the hospital and had no basis for making medical judgments.  Finally, Extendicare maintains that Carlson had no good-faith basis for believing that an investigation into the circumstances of CP's death had not been commenced.

Extendicare also alleges that Carlson's initial conversation with Dickson was not a report under the Whistleblower Act because as a matter of law, an informal conversation with a supervisor is not a report.  Extendicare argues that Carlson never followed up on her concerns– she never made a written report, contacted the administrator, Human Resources, the regional office, the corporate office, or the compliance hotline.

Section 181.932, subd. 1(d) protects, in relevant part, an employee who makes a good faith report of a situation in which a health care facility violates a state or federal law and potentially places the public at risk of harm.  Minn. Stat.

§ 181.932, subd. 1(d).  See Skare v. Extendicare Health Servs., Inc., 432 F. Supp. 2d 969, 973-74 (D. Minn. 2006).  Whether a report was made in good faith is a question of fact, but courts may decide as a matter of law that certain conduct does not constitute a "report."  Cokely, 623 N.W.2d at 630.  Minnesota courts use the commonsense definition of "report" to determine whether the communication at issue qualifies as a report under the Act.  Gee v. Minn. State Colls. & Univ., 700 N.W.2d 548, 555 (Minn. Ct. App. 2005).  Thus, report means either (1) "[t]o make or present an often official, formal, or regular account of" or (2) "[t]o relate or tell about; present."  Janklow v. Minn. Bd. of Exam'rs for Nursing Home Adm'rs, 536 N.W.2d 20, 23 (Minn. Ct. App. 1995) (quoting American Heritage Dictionary 1531 (3d ed. 1992)).

To qualify as a good-faith report, the employee must "blow the whistle" for the purpose of exposing an illegality.  Obst v. Microtron, Inc., 614 N.W.2d 196, 202 (Minn. 2000).  Thus, courts look beyond the content of the report and consider the employee's purpose in making the report.  Id.  Although the employee must report a suspected legal violation, "[a]n employee need not identify the specific law that the employee believes was violated, 'so long as there is a federal or state law or rule adopted pursuant to law that is implicated by the employee's complaint . . . and the employee alleges facts that, if proven, would

constitute a violation of law or rule adopted pursuant to law.'"  Gee, 700 N.W.2d at 555 (quotation omitted).

However, employees do not engage in protected activity when making reports in the normal course of their job duties.  See Freeman v. Ace Telephone Ass'n, 404 F. Supp. 2d 1127, 1140 (D. Minn. 2005) (holding that CEO simply doing his job in making report because he was responsible for the financial health of the company and had a duty to report to the Board any irregularities in the Board's practices).  See also Gee, 700 N.W.2d 548 (finding that plaintiff did not have a whistleblower claim when her stated purpose in reporting was to fulfill her responsibilities as a faculty advisor).

Carlson reported a situation involving the quality of health care services as defined in 181.932, Subd. 1(d).  Extendicare's argument that Carlson did not make an internal report is irrelevant because Carlson reported possible violations of state and federal law to a Minnesota state agency– the Minnesota Department of Health.  Carlson made good faith reports of possible legal violations to the DOH when she informed the agency of the circumstances of CP's death and what she knew of Extendicare's alleged "no-hospitalization" policy.  Viewing the evidence in the light most favorable to Carlson, it is evident that Carlson alerted the DOH for the purpose of blowing the whistle; she had a good faith belief that CP was neglected and that this may have been linked to Extendicare's policy.  Carlson was

aware of the circumstances of CP's death– that CP had called an ambulance, that it had been sent away, and that the next day CP's oxygen levels dropped dramatically before her death.  Carlson also knew that none of this information was documented in CP's medical records and that when she reported her concerns to Dickson, he did not ask her to make her report in writing, or follow up with her after their meeting.  Furthermore, Carlson had inquired about the "no-hospitalization" policy, and it was explained to her by her supervisor.  The Court concludes that viewing the facts in the light most favorable to Carlson, she had a good faith belief that Extendicare had violated state and/or federal laws in the manner in which CP was treated, and that this may have been linked to the alleged "no-hospitalization" policy.  Furthermore, the Court notes that the DOH in fact found that Extendicare had violated several state and federal regulations and that CP had been neglected.

     The Court also dismisses Extendicare's argument that Carlson was merely doing her job in making her reports.  This argument relies on cases where employees held compliance-related positions, while Carlson was an entry-level clerk, with no medical or legal training, and most importantly, no responsibility to oversee Extendicare's legal and regulatory compliance.  In Freeman, the plaintiff held a position as CEO of a corporation, and had a responsibility to report financial irregularities in the Board of Director's practices.  404 F. Supp. 2d at 1127.

Likewise, the plaintiff in Gee, who was a faculty advisor, made inquiries to fulfill her responsibilities as a faculty advisor to the student organization, not because she suspected any illegal activity. 700 N.W.2d at 548. Extendicare employs a Compliance Team in its Corporate offices and has a corporate legal department. (Halunen Aff. Ex. 2 at 30.) Individual facilities also have several layers of employees responsible for facility oversight. Carlson had no supervisory role in the company, and no compliance duties other than those shared by all health care employees. Thus, the Court finds that Carlson is a protected whistleblower under the Act.

### 2. Adverse Employment Action

The Complaint states that Carlson suffered adverse employment actions because she was denied employment opportunities and was constructively discharged. Because no facts relating to a denial of employment opportunities have been alleged, the Court will only consider Plaintiff's theory of constructive discharge.

### a. Constructive Discharge Based on Conditions at the Trevilla Facility

Carlson argues that she was constructively discharged because her working conditions were so intolerable that no reasonable person would be expected to continue the employment. Carlson alleges that she witnessed numerous cases of abuse at Trevilla and that Extendicare did nothing to correct these abuses.

Carlson asserts that Extendicare lied about and attempted to cover-up its negligence as to CP and that no reasonable person could be expected to work for an employer that would violate the basic rights and dignities of patients. As to the issue of intent, Carlson asserts that it was foreseeable that she would resign her position because Extendicare was on notice that its illegal practices would likely force employees to terminate their employment.

Constructive discharge occurs when an employer deliberately renders the employee's working conditions intolerable, effectively forcing her to quit. Tatum v. Ark. Dep't of Health, 411 F.3d 955, 960 (8th Cir. 2005). To prove a case of constructive discharge, a plaintiff must show that: (1) a reasonable person in her situation would find the working conditions intolerable and (2) the employer intended to force the employee to quit. Id. The intent requirement may be shown by evidence that the employee's resignation was a reasonably foreseeable consequence of the employers discriminatory actions. Hukkanen v. Int'l Union of Operating Eng'rs, 3 F.3d 281, 285 (8th Cir. 1993).

In another recent whistleblower case involving Extendicare as the defendant, the plaintiff's claim of constructive discharge was also based on general working conditions experienced by other employees at the company. The court concluded that, "[w]here employees are subjected to the same working conditions, 'no particular employee can claim that difficult working conditions

17

signify the employer's intent to force that individual to resign.'" Skare, 432 F. Supp. 2d at 977 (citing Allen v. Bridgestone/Firestone, Inc., 81 F.3d 793, 797 (8th Cir. 1996)).     Carlson has not established that she was constructively discharged on the basis of intolerable conditions common to employees at Extendicare's Trevilla facility.  Although Carlson alleges that her conditions were intolerable due to patient abuse and neglect, to establish a claim of constructive discharge she must allege that because of her report her conditions were rendered so intolerable that it was at least reasonably foreseeable that she would resign.  Because this theory of constructive discharge is not based on conduct specifically directed at Carlson in response to her protected activity, it must fail.  Thus, the Court concludes that Carlson was not constructively discharged on the basis of her experience with Extendicare's alleged patient abuse and neglect.

>           **b.      Constructive Discharge Based on Treatment of
>                    Carlson After She Engaged in Protected Activity**

Carlson also alleges that she was retaliated against after she engaged in protected activity.  She asserts that after she made her report, employees at Extendicare, specifically Clinical Coordinator Christine Bates and DON Todd Dickson, made her working conditions intolerable.

The standard used to determine what constitutes intolerable conditions is a objective one, taking into account what a reasonable employee would judge intolerable, rather than the employee's subjective feelings.  Gartman v. Gencorp,

Inc., 120 F.3d 127, 130 (8th Cir.1 997).  A feeling of being unfairly criticized or having to endure difficult or unpleasant working conditions do not constitute intolerable working conditions.  Id.; see also Coffman, 141 F.3d at 1248 (finding that although plaintiff's working conditions were unpleasant and tinged with retaliatory acts, they were not objectively intolerable.)  Additionally, the employee has an obligation to be reasonable and not to assume the worst, and not to jump to conclusions too quickly.  Breeding v. Arthur J. Gallagher & Co., 164 F.3d 1151, 1160 (8th Cir. 1999); Coffman v. Tracker Marine, L.P., 141 F.3d 1241, 1247 (8th Cir. 1998) ("If an employee quits without giving her employer a reasonable chance to work out a problem, then she has not been constructively discharged.")

  The intolerable conditions alleged by Carlson amount to several uncomfortable or stressful hours.  Carlson asserts that Bates talked about her and reprimanded her for a charting error in front of other employees, that other employees avoided her, and that Dickson avoided eye contact with her.  This conduct does not rise to the level of constructive discharge.  Although Carlson must have been distraught over this conduct, intolerable conditions are judged from an objective standard and a reasonable employee would not feel she had no choice but to resign based on the treatment received by Carlson after her report was made.

Moreover, Carlson had an obligation to be reasonable and give Extendicare a chance to cure the alleged retaliation. By resigning within hours of the alleged retaliatory treatment, she failed to meet this obligation.

Although Carlson claims that she was treated differently after making her report to the DOH, feelings of being ignored and a few verbal comments do not legally constitute constructive discharge. Furthermore, the Court notes that Carlson was not disciplined or demoted in any way prior to her resignation. Thus, the Court concludes that Carlson did not suffer an adverse employment action.

Accordingly, based upon the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

a. Defendant Extendicare's Motion for Summary Judgment [Docket No. 67] is **GRANTED.** Counts I and II of the Complaint are **DISMISSED WITH PREJUDICE.**

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: July 26, 2006               s / Michael J. Davis
                                   Judge Michael J. Davis
                                   United States District Court